E-FILED
Thursday, 17 September, 2026 04:28:31 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| **ANNET GODIKSEN,** <br> **Plaintiff,** | ) <br> ) <br> ) | |
| **v.** | ) | **Case No. 23-cv-3223** |
| **ILLINOIS ENVIRONMENTAL PROTECTION AGENCY,** <br> **Defendant.** | ) <br> ) <br> ) <br> ) | |

**OPINION**

**COLLEEN R. LAWLESS, United States District Judge:**

Plaintiff Annet Godiksen filed a Complaint asserting claims under the anti-retaliation provision of Title VII of the Civil Rights Act of 1964, alleging her former employer, Defendant Illinois Environmental Protection Agency ("IEPA"), retaliated against her after she reported concerns of a sexually hostile working environment. For the reasons that follow, Defendant's Motion for Summary Judgment (Doc. 22) is Granted.

## I. FACTUAL BACKGROUND[1]

### A. Plaintiff's Employment and Structure of IEPA Legal Department

On May 17, 2004, Plaintiff began her employment with Defendant IEPA as an attorney holding the position of Technical Advisor II in IEPA's Division of Legal Counsel. (Doc. 22, ¶ 1). From March 1, 2006, until her departure from IEPA on November 16, 2022, Plaintiff held the position of Technical Advisor III in IEPA's Air Regulatory Unit in the

[1] Unless otherwise noted, the factual background of this case is drawn from the undisputed facts as conceded to in Defendant's statement of material facts; Plaintiff's response to Defendant's statement of material facts and additional material facts; Defendant's reply to Plaintiff's additional facts; and exhibits to the filings.

Division of Legal Counsel. (*Id.* at ¶ 2). IEPA hired Dana Vetterhoffer in January 2008 as a Technical Advisor II in IEPA's Air Regulatory Unit in the Division of Legal Counsel. (*Id.* at ¶ 3). In June 2015, Vetterhoffer was temporarily assigned as a Deputy General Counsel, also referred to as the manager, for the Air Regulatory Unit in the Division of Legal Counsel, and was permanently assigned to that position in February 2017. (*Id.* at ¶ 4). As Deputy General Counsel for the Air Regulatory Unit, Vetterhoffer directly supervised Rachel Doctors, Kent Mohre, Antoinette Palumbo, Charles Matoesian, Gina Roccaforte, and Plaintiff Godiksen, which included, among other tasks, approving timecards, overtime requests, and absences and giving out assignments. (*Id.* at ¶ 5).

Individuals who hold the position of Deputy General Counsel report directly to the Chief Legal Counsel. (*Id.* at ¶ 6). From February 2019 to approximately February 2020, Vetterhoffer served as IEPA's Acting Chief Legal Counsel. (*Id.* at ¶ 7). While serving as Acting Chief Legal Counsel, Vetterhoffer continued to directly supervise staff in the Air Regulatory Unit. (*Id.* at ¶ 8). In March 2020, Vetterhoffer returned to her role as Deputy General Counsel for the Air Regulatory Unit. (*Id.* at ¶ 9). In March 2020, Chuck Gunnarson became the Chief Legal Counsel for IEPA and remained in that position until June 2024. (*Id.* at ¶ 10). The duties for the attorneys in the Air Regulatory Unit include working with the Bureau of Air in developing air pollution control regulations, taking those regulations through the administrative rulemaking process, engaging in contract review, advising on legislative matters, drafting legislation, conducting legal research for the Bureau of Air, and advising on procurement. (*Id.* at ¶ 11).

In June 2015, Joanne Olson became the Acting Deputy General Counsel of the Water Regulatory Unit in the Division of Legal Counsel and, in January 2017, she became the Deputy General Counsel of the Water Regulatory Unit and served in that position until she left IEPA in January 2020. (*Id.* at ¶ 12). In those capacities, Olson directly supervised Rex Gradeless, Stefanie Diers, Stephanie Flowers, and Sara Terranova. (*Id.* at ¶ 13). In December 2019, Stefanie Diers became the Deputy General Counsel of the Water Regulatory Unit. (*Id.* at ¶ 14).

John Kim began working at IEPA in 1996 as a Technical Advisor II, also known as an assistant counsel. (*Id.* at ¶ 15). From 2006 until 2009, Kim was the Deputy General Counsel of the Air Regulatory Unit and directly supervised Plaintiff. (*Id.* ¶¶ 16-17). From 2009 to 2019, Kim was the Chief Legal Counsel, or General Counsel for the IEPA. (*Id.* at ¶ 18). The Chief Legal Counsel directly oversees the six deputy general counsel who oversee the staff attorneys, spends time reporting directly to the Director of IEPA and the Governor's Office, interacts with the Bureau Chiefs of the three bureaus within IEPA, and gets involved in external interactions. (*Id.* at ¶ 19). From October 25, 2011, to March 1, 2013, Kim took a leave of absence from his employment with IEPA. (*Id.* at ¶ 20).

Alec Messina was the Acting Director of the IEPA from July 2016 to January or February 2019, at which time he became Director of IEPA until July 2024. (*Id.* at ¶¶ 21-22). The Director of IEPA maintains contact with the Governor's Office; assists with the implementation of the Governor's policies and goals; works closely with IEPA Chief Legal Counsel, Bureau Chiefs, and Deputy Director; and works closely without agencies, elected officials, members of the public, and trade associations. (*Id.* at ¶ 23).

**B. Plaintiff's Charge of Discrimination and Complaint**

Plaintiff alleges she was retaliated against in violation of Title VII of the Civil Rights Act of 1964 for engaging in protected activity. (*Id.* at ¶ 24). Plaintiff is not asserting claims for sexual harassment, a sexually hostile working environment, or gender discrimination. (*Id.* at ¶ 25).

On October 23, 2017, Plaintiff filed a Charge of Discrimination with the Illinois Department of Human Rights in which she alleged she was subject to gender discrimination and retaliation. (*Id.* at ¶ 26). In her Charge, Plaintiff stated that she refused unwanted sexual advances at work and that IEPA retaliated against her "by creating a hostile work environment owing to her refusing these advances." (*Id.* at ¶ 27). Plaintiff subsequently received a notice of right to sue from the Equal Employment Opportunity Commission. (*Id.* at ¶ 28).

On July 10, 2023, Plaintiff filed a Complaint alleging she was retaliated against in violation of Title VII. (*Id.* at ¶ 29). Plaintiff alleges she reported concerns about sexual harassment and retaliation based on her opposition to the sexual harasser's actions to her manager in February 2017. (*Id.* at ¶ 30). An internal investigation was opened in August 2017, and Plaintiff indicated in her interview that she had opposed sexual harassment and complained that she had been subject to sexual harassment and retaliation. (*Id.* at ¶ 31). Plaintiff further alleges that her "actions in opposing sexual harassment and gender discrimination as described above constitute protected activity under Title VII." (*Id.* at ¶ 32). Plaintiff claims she was subjected to a sexually hostile work environment and/or was

sexually harassed by John Kim beginning on November 28, 2005, until late Fall 2006. (*Id.* at ¶ 33).

Plaintiff asserts she engaged in the following protected activities: (1) opposing the sexually hostile environment and/or sexual harassment by directly voicing her opposition to John Kim from January 2006 to January 2007; (2) reporting to Dana Vetterhoffer that Kim had hit on her in March/April 2017; (3) reporting Kim's harassment and poor treatment of Plaintiff to Joanne Olson on August 4, 2017; and (4) reporting the sexual harassment Plaintiff allegedly suffered while employed by IEPA during an interview with Jill Johnson and Vetterhoffer on August 23, 2017. (*Id.* at ¶ 34). Plaintiff claims she was treated poorly after reporting the harassment. (Doc. 27, ¶ 3). Vetterhoffer told Plaintiff she reported Plaintiff's concerns to EEO Coordinator, Jill Johnson. (*Id.* at ¶ 4). In August 2017, Plaintiff asked Olson about the complaint process related to sexual harassment. (*Id.* at ¶ 5). On August 23, 2017, Plaintiff was interviewed by Johnson in the presence of Vetterhoffer. Plaintiff later submitted a timeline and emails but never heard back concerning her complaints. (*Id.* at ¶ 8). Plaintiff did not engage in any protected activity between 2007 and early 2017 regarding her retaliation claim. (Doc. 22, ¶ 35).

**C. Alleged Retaliation—Computer Monitor**

Jill Johnson testified there were several ways an employee could request a reasonable accommodation, including by contacting her, their supervisor, or the human resources department. (*Id.* at ¶ 37; Doc. 27, Resp. to ¶ 37). When employees contact Johnson about a reasonable accommodation, she would provide them with a form to complete and would request medical documentation in support of the request. (Doc. 22-

15 at 12-13). After the employee completes the reasonable accommodation form, the employee submits the form to their supervisor for the supervisor to state whether the accommodation is recommended or not recommended. (Doc. 22, ¶ 39). Once the supervisor makes their decision as to recommendation, the reasonable accommodation form is submitted to the ADA Coordinator who makes a recommendation, and then the request is submitted to the Reasonable Accommodation Committee, and then to the Director for a final determination. (*Id.* at ¶ 40).

Plaintiff alleges she submitted a reasonable accommodation request to Bruce Carlson on May 4, 2007, at the direction of John Kim. (*Id.* at ¶¶ 41, 42). Carlson was not Plaintiff's supervisor. He was employed in IEPA's Division of Information Services where his job duties did not include receiving or processing accommodation requests. (*Id.* at 42; Doc. 27, Resp. ¶ 42). While IEPA alleges it has no record of Plaintiff's 2007 reasonable accommodation request, Plaintiff disputes the assertion because Pamela Smith's affidavit does not explain how or whether she looked for the document. (*Id.* at ¶ 43, Resp. ¶ 43).

On November 27, 2013, IEPA received an ADA accommodation request from Plaintiff regarding her computer display due to eyestrain and sensitivity to a flicker on the monitor. (Doc. 27, ¶ 44). On December 16, 2013, John Kim recommended the accommodation be approved. (*Id.* at ¶ 45). On December 19, 2013, Jill Johnson informed Plaintiff that current supporting medical documentation was needed for her reasonable accommodation form, which Plaintiff submitted the following day. (*Id.* at ¶ 46). Plaintiff's medical documentation stated that she had eyestrain and a flicker sensitivity and needed

a Video Display Terminal with a vertical refresh rate of at least 100 Hz, the higher the refresh rate the better; to upgrade to DVI cables for a more stable video signal; no fluorescent lighting; and to ensure all parts of the light fixtures were working properly. (*Id.* at ¶ 47). Less than 30 minutes after Plaintiff sent her medical documentation, IEPA approved her reasonable accommodation request. (*Id.* at ¶ 48). Plaintiff received a monitor, operating at 120 Hz, which addressed her accommodation in 2014. (*Id.* at ¶ 49).

Plaintiff believes John Kim interfered from 2007 to 2014 with her receiving the requested equipment because other employees did not have to go through such a lengthy process to obtain an accommodation. (*Id.* at 45-46). While Plaintiff testified that an IEPA telephone liaison and a person working in labs received special equipment, she did not know how long the process took for those employees. (*Id.* at 46-49, 56). Plaintiff testified she also did not know whether the large monitors provided to the telephone liaison would have been adequate to meet her needs. (*Id.* at 49).

Plaintiff alleges Pam Smith, AJ Johnson, Dana Vetterhoffer, and John Kim retaliated against her from October 23, 2018 to summer 2023, in part, by removing her computer and/or monitor and by taking a prolonged period to provide sufficiently equivalent equipment that would accommodate Plaintiff's alleged disability. (Doc. 22, ¶ 54). Individuals who do not have a flicker sensitivity are not able to see the issues with the monitor. (*Id.* at ¶ 55). In October 2018, individuals from the Department of Innovation and Technology ("DoIT") replaced Plaintiff's computer with a new computer, even though she told them her computer was an ADA accommodation. (*Id.* at ¶ 56). DoIT is a separate state agency from IEPA. (*Id.* at ¶ 57). Plaintiff believes her computer was

replaced in 2018 because it was outdated. (*Id.* at ¶ 58). In December 2018 and January 2019, DoIT and IEPA made numerous attempts to address Plaintiff's computer and monitor issue, including: (1) installing a different graphics card; (2) installing a new cable; (3) requesting specifications needed for a new monitor; (4) ordering and installing a new computer; (5) installing a display port cable and attempting to download drivers; (6) ordering items the Plaintiff suggested; and (7) installing the same old model computer Plaintiff had used until October 2018. (*Id.* at ¶ 59). Plaintiff believed that all IEPA needed to do to address her monitor issue was to put back the equipment that was taken by DoIT in 2018. (*Id.* at ¶ 60). Plaintiff claims that, despite reaching out to Pam Smith and others about problems with the computer monitor, the problems persisted until early 2020. (Doc. 27, ¶¶ 16-18).

By February 19, 2019, DoIT had increased Plaintiff's monitor refresh rate to 130 Hz and had installed a DVI cable. (Doc. 22, ¶ 61). After these changes, Plaintiff reported that the text on the screen was not clear. (*Id.* at ¶ 62). The text on the screen being fuzzy or not clear was a different issue than the flicker sensitivity issue. (*Id.* at ¶ 63). Other attempts were made by DoIT and IEPA to address Plaintiff's complaint of unclear text , including: (1) installing a second new computer for Plaintiff on March 28, 2019; (2) installing a third new computer on June 10, 2019; and (3) installing a fourth new computer on November 14, 2019, which resolved Plaintiff's issues. (*Id.* at ¶¶ 64-65). The fourth computer was specially ordered, took six weeks to arrive, and cost $4,760.00. (*Id.* at ¶ 66). John Kim was aware of Plaintiff's computer issues but was not required to approve or deny the request (*Id.* at ¶ 67, Doc. 27, Resp. ¶ 67).

**D. Alleged Retaliation—Office Furniture and Storage**

Plaintiff alleges the following retaliation by John Kim regarding office furniture and storage: (1) December 2006 to January 2007: Kim initially denied Plaintiff's request for an unused computer desk but the requested desk was provided by January 9, 2007; (2) January 2007 to May 2011: Plaintiff requested that the old table and desk that were too high be removed but that did not happen until May 19, 2011; (3) May 19, 2011: Plaintiff's request for additional filing cabinets and a bookshelf for storage was denied; (4) August 11, 2011: Plaintiff was not allowed to replace her broken chair with chairs in the conference room and instead had to "forage" for a chair from the agency discard/surplus pile; and (5) Plaintiff obtained filing cabinets from the surplus area, despite being denied additional storage. (*Id.* at ¶ 68).

**E. Alleged Retaliation–Temperatures**

Plaintiff alleges John Kim retaliated against her in regard to temperatures in a work area known as "the Cave" from April 2016 to November 2016. (*Id.* at ¶ 69). The Cave is in an area of the Division of Legal Counsel on the second floor with cubicle numbers 87 through 108. (*Id.* at ¶ 70). From the beginning of her employment until May 2018, Plaintiff was assigned to cubicle 102 in the Cave. (*Id.* at ¶ 71). While there may have been some temperature issues in the Cave when Plaintiff first started working at IEPA, it was not a regular occurrence until 2016. (*Id.* at ¶ 72). The temperature issues in the Cave when work was performed on one of two air conditioning units. (*Id.* at ¶ 73. Plaintiff believed the cold temperatures in the Cave was Kim's way of retaliating against her for reporting harassment because he waited to adjust the thermostats until the end of November 2016.

(*Id.* at ¶ 74). Plaintiff testified that she has photographs of thermostats which reflect the low temperatures. (*Id.*)

**F. Alleged Retaliation—Cubicle Move**

Plaintiff alleges John Kim, Alec Messina, Pam Smith, and Donavan Griffith retaliated against her regarding a cubicle move from February 23, 2017, through August 17, 2017. (*Id.* at ¶ 75). At IEPA, when new employees started, they were put in cubicles available at the time, which may have been slightly bigger or near a window. (*Id.* at ¶ 76). The Division of Legal Counsel started a practice outside the collective bargaining agreement that allowed attorneys on a semi-periodic basis to select from the available empty cubicles in order of seniority, with the most senior attorney selecting either an empty cubicle or not to move, and the second person in seniority selecting from any remaining empty cubicles. (*Id.* at ¶ 77). In 2017, IEPA Division of Legal Counsel followed this practice and allowed attorneys to move cubicles. (*Id.* at ¶ 78). On March 9, 2017, when given the option to move cubicles, Plaintiff declined based on what was available at the time. (*Id.* at ¶ 79).

On June 9, 2017, John Kim sent an email stating Charles Matoesian, who was higher in seniority than Plaintiff, initially stated he was moving before deciding not to move. (*Id.* at ¶ 80). The empty cubicle that Matoesian originally selected was then selected by Stephanie Flowers, who was one above Plaintiff in seniority. (*Id.* at ¶ 81). Plaintiff contends she should have been given a second chance to move cubicles by being offered Flowers' now-vacant cubicle. However, on August 9, 2017, John Kim told Plaintiff he was pressed for time so he decided only to give individuals who had already stated they were

interested in moving the option of moving to that cubicle. (*Id.* at ¶ 82). Kim was not aware that Plaintiff had reported him for harassment and retaliation when he made the decision to not allow Plaintiff a second chance to move cubicles. (*Id.* at ¶ 83). When Plaintiff first chose not to move cubicles, there were empty cubicles outside of the Cave that she could have selected. (*Id.* at ¶ 84).

**G. Alleged Retaliation–Lighting**

Plaintiff alleges John Kim, Jill Johnson, Dana Vetterhoffer, and Alec Messina retaliated against her in regard to providing an ADA accommodation in the form of lighting that Plaintiff first raised in January or February 2018 prior to moving to the 4th floor in May 2018. (*Id.* at ¶ 85). Plaintiff provided a doctor's letter as directed concerning her condition. (Doc. 27, ¶ 20). Johnson never communicated with the legal counsel office or the Director for input on the requested accommodation. (Doc. 22, ¶ 86).

**H. Alleged Retaliation – Arrival and Departure Emails**

Plaintiff alleges Vetterhoffer, Kim, and Messina retaliated against her with respect to a memorandum of understanding requiring arrival and departure emails from December 13, 2018, to March 18, 2019. (*Id.* at ¶ 87). Plaintiff was a member of the American Federation of State, County, and Municipal Employees ("AFSCME"). (*Id.* at ¶ 88). On November 29, 2018, Messina signed a memorandum of understanding effective December 17, 2018, that required all IEPA union employees who worked a different schedule than their supervisor to send an email stating they were "in" for the day and an email stating they were "out" for the day. (*Id.* at ¶ 89). Vetterhoffer testified she and other managers received clarification from Kim that attorneys were required to send in/out

emails if their start or end time were different from their supervisor. (Doc. 22-5 at 33-34). Plaintiff believed that two attorneys in her unit, Gina Roccaforte and Antonette Palumbo, should have been required to send in/out emails but were not. (Doc. 22, ¶ 91). At the time of the memorandum, Plaintiff worked later than Vetterhoffer, meaning Plaintiff was required to send in/out emails. (*Id.* at ¶ 92). Vetterhoffer testified she did not require the three other attorneys in her unit to send in/out emails because they started the workday later than her and ended work either at the same time or earlier than Vetterhoffer. (Doc. 22-5 at 35). Vetterhoffer further states Plaintiff was not required to send in/out emails because she had reported Kim's alleged sexual harassment. (Doc. 22-6, ¶ 12).

Plaintiff described the email requirement as "extremely stressful" and believed it would be used selectively to discipline certain employees. (Doc. 27, ¶ 21). The in/out email memorandum was rendered void in March 2019 per a grievance settlement agreement signed by the union and by John Kim as the director. (Doc. 22, ¶ 95).

**I. Alleged Retaliation—Bereavement Leave**

Plaintiff alleges Pam Smith and John Kim retaliated against her by denying bereavement leave from August to September 2019. (*Id.* at ¶ 96). The bereavement leave policy was a new benefit under the union contract that went into effect after Plaintiff's mother passed away. (*Id.* at ¶ 97). The bereavement leave policy provided, in part, "Upon request, employees shall be granted paid leave of up to two (2) scheduled workdays to attend the funeral or similar service, for related travel, and bereavement time, upon the death of a member of the employee's immediate family. . . . Documentation of the reason for the funeral/bereavement leave, attendance at the funeral or similar service, and

relationship to the deceased may be required." (*Id.* at ¶ 98). While Plaintiff testified she has no evidence that John Kim was aware of her request for bereavement leave, Plaintiff believed he was aware based on his close working relationship with Pam Smith. (Doc. 22-2 at 117-18).

When Pam Smith received Plaintiff's request to use bereavement leave, the policy was new and Smith contacted the Department of Central Management Services ("CMS") to ensure she handled the request consistently across agencies. (Doc. 22, ¶ 100). Smith emailed her liaison, Karen Weathers, and others as follows:

> I have an employee whose mother passed away on June 6. She tried to use bereavement leave the first week of July to deal with estate issues. The request was denied. She then called Karen at CMS to complain—not sure of the outcome of the phone call. Without asking again she then requested bereavement leave for July 22 and July 23. She is claiming "bereavement" as this was around the time of her mother's birthday (July 21).
> This was her exact response:
>
> Bereavement means to grieve. The time was for a celebration of life around my mother's birthday and to grieve, given the proximity to her death.
>
> I believe the only celebration of live [sic] event was the employee remembering her mother on her birthday. She provide[d] the June 6 obituary, but no additional details. Please advise on if this should be approved or denied. I want to be consistent with other Agencies and with the intent of the agreement.

(Doc. 22-31 at 1). Smith stated Weathers advised her to deny Plaintiff's request. (*Id.*) On August 3, 2019, Smith emailed Plaintiff stating, in part, "If there was a true celebration of life event that family could attend, please provide the documentation." (Doc. 22-33). Plaintiff responded there was a "true" celebration of life and she had provided

documentation. (*Id.*) Smith replied that the request for bereavement leave was denied and that she needed to change the time off to vacation leave. (*Id.*)

### J. COVID-19 and Remaining Allegations of Retaliation

Plaintiff alleges Dana Vetterhoffer retaliated against her during the COVID-19 pandemic through the following actions: 1) requesting Plaintiff use a COVID-related time-off code and denying her a laptop in April 2020; 2) not being given an agency laptop or assistance from her manager to install Citrix to access systems remotely in September 2021; and 3) being given the least desirable in-office schedule out of everyone in her unit in May 2022. (Doc. 22, ¶ 104). The COVID-related time code was created to allow employees to code their time as paid, even if they did not have sufficient work that they could complete remotely, but Plaintiff believed the COVID-related time code was going to be used to lay people off. (*Id.* at ¶ 105). Plaintiff testified she was not aware of anyone being laid off during the COVID pandemic. (Doc. 22-2 at 123). Plaintiff never used the COVID-related time code and was never disciplined at IEPA. (Doc. 22, ¶¶ 107, 108).

During the first couple of months of COVID-19, Plaintiff was aware of four attorneys—Kyle Davis, Robb Layman, Mike Roubitchek, and Sara Terranova—in the Division of Legal Counsel who received laptops to work from home. (Doc. 22-2 at 126-29). According to Vetterhoffer, Plaintiff was not offered a laptop in the initial work from home period because she had no assignments at that time. (Doc. 22-6, ¶ 15). No one in Plaintiff's unit, Air Regulatory, was given a laptop from IEPA. (Doc. 22, ¶ 111). Vetterhoffer was not responsible for allowing Terranova, Layman, Davis, or Roubitchek to use IEPA laptops. (*Id.* at ¶ 112).

Plaintiff believed she received one of the least desirable in-office schedules in May 2022 when she was given a hybrid schedule because she had to be in the office on Tuesdays and Wednesdays, which were the most crowded days. (*Id.* at ¶ 113). Chuck Gunnarson informed all Division of Legal Counsel managers, including Vetterhoffer, of the following hybrid schedule guidelines; 1) attorneys were to receive three office days and two remote days; 2) attorneys working a 9-day schedule with every other Monday or Friday off had to have one of their remote days as either the Monday or Friday that they had off; 3) no one could have remote days on both Mondays and Fridays without special circumstances, and 4) at least one attorney needed to be in the office each day of the week to the extent possible. (*Id.* at ¶ 114).

In April 2022, all four attorneys in Plaintiff's unit, including Plaintiff, submitted hybrid work schedules that indicated only one in office day weekly, rather than three in office days as required. (*Id.* at ¶ 115). When reviewing the hybrid schedule requests for the four attorneys in the Air Regulatory Unit, Vetterhoffer first approved the one in office day each attorney had indicated, which meant that Matoesian would be in office on Mondays, Palumbo would be in office Tuesdays, and Plaintiff would be in office Fridays. (*Id.* at ¶ 116). Next, Vetterhoffer determined that one of Roccaforte's remote days had to be Friday because she was on a 9-day schedule with every other Friday off and that Roccaforte's second (of three) in office days had to be Monday because attorneys could not work remotely both Mondays and Fridays. (*Id.* at ¶ 117). Vetterhoffer decided Roccaforte's third in office day would be Thursday. (*Id.* at ¶ 118). Antonette Palumbo asked Vetterhoffer if she could work the same in office schedule as Roccaforte because

they often collaborated, and Vetterhoffer agreed to the request. (*Id.* at ¶ 119). Vetterhoffer chose to have Plaintiff work remotely on Mondays and Thursdays because three of the four Air Regulatory attorneys were already working in office on those days and she had not received any other schedule preferences from Plaintiff. (*Id.* at ¶ 120).

Plaintiff alleges numerous IEPA employees were treated more favorably because they were allowed to take "liberties" with their time--by leaving early and arriving late, coming and going as they pleased, taking longer lunches, switching days off, etc. — including Vetterhoffer, Roccaforte, Palumbo, Davis, Kim Geving, James Kropid, Layman, Carter, Terranova, Kim, Messina, Armitage, and Bloomberg. (Docs. 22-4 at 67-68, 22-2 at 133-34). Plaintiff testified she was never disciplined for taking "liberties" with her time by, for example, taking longer lunches. ((Doc. 22-2 at 134).

Dana Vetterhoffer was never responsible for monitoring the timekeeping practices of Kropid, Flowers, and Layman because they were not in the Air Regulatory Unit. Although Vetterhoffer was responsible for reviewing Greving's timekeeping as Acting Chief Legal Counsel from February to December 2019 and may have been responsible for reviewing Davis's timekeeping from January 2020 to February 2020, she did not treat Greving or Davis any differently from any other attorneys that she supervised. (Doc. 22, ¶ 124). Plaintiff alleges Sally Carter, Christine Zeivel, and Rex Gradeless were treated more favorably because they earned overtime. (*Id.* at ¶ 125). Vetterhoffer was never responsible for directly approving overtime for Carter, Zeivel, or Gradeless because they were not in the Air Regulatory Unit. (*Id.* at ¶ 126).

Plaintiff alleges Christine Zeivel and Mike Roubitchek were treated more favorably in regard to furniture they received. (*Id.* at ¶ 127). For reasons unknown to Plaintiff, Zeivel received a typing table. (*Id.* at ¶ 128). Plaintiff believes John Kim approved a couch for Mike Roubitchek. (*Id.* at ¶ 129). Plaintiff further believes Alec Messina reprimanded Kim for approving the couch. (*Id.* at ¶ 130). Plaintiff believes the couch is connected to her report of harassment in 2017 and her opposition to harassment in 2006 and 2007 because her basic needs were not being met but John Kim was going above and beyond for others. (*Id.* at ¶ 131).

On November 16, 2022, Plaintiff started a position with Illinois Department of Healthcare and Family Services earning a monthly salary of $11,759 and receiving comparable benefits to those she received while employed by IEPA. (*Id.* at 132). Plaintiff is claiming damages solely in the form of emotional distress. (*Id.* at ¶ 133).

## II. DISCUSSION

In seeking summary judgment, IEPA contends Plaintiff's retaliation claims occurring prior to December 27, 2016, are untimely and that she cannot show a materially adverse action and/or establish a causal connection between her protected activity and any alleged adverse action.

Plaintiff acknowledges her retaliation claim does not include incidents prior to February 2017.[2] She contends summary judgment is not warranted because a jury could

[2] Plaintiff states that she provided a detailed timeline because discovery is broad and encompasses background information in addition to the incidents involved in her claim. Furthermore, such evidence could be relevant at trial.

reasonably conclude that she was retaliated against with respect to her ADA accommodation requests, workplace seating assignments, and the denial of certain types of leave. Furthermore, Plaintiff asserts there is a factual dispute regarding whether this occurred because of her protected activity.

**A. Summary Judgment Standard**

Summary judgment is appropriate under Rule 56 if the "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Metzler v. Loyola University Chicago*, 164 F.4th 612, 616 (7th Cir. 2026) (citations omitted). The Court construes all facts and draws all reasonable inferences in favor of the non-movant. *Id.* In considering whether summary judgment is warranted, the Court does not weigh evidence, resolve credibility disputes, or choose between competing factual narratives. *Johnson v. Edwards*, 164 F.4th 1074, 1079 (7th Cir. 2026). The moving party may prevail "by showing an absence of evidence to support the non-movant's claims." *Metzler*, 164 F.4th at 616.

**B. Retaliation Claims**

Under Title VII, an employer may not retaliate against an employee for opposing discriminatory employment practices. 42 U.S.C. § 2000e-3(a). To survive summary judgment, a plaintiff "must present evidence from which a reasonable jury could find that: (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse employment action; and (3) there was a but-for causal connection between the two." *Abayomi v. Collins*, 182 F.4th 587, 596 (7th Cir. 2026). While "[t]he protected activity need

not be the *only* cause of the adverse action," the plaintiff must show "that the adverse action would not have happened *without the activity*." *Id.* (internal quotation marks and citations omitted) (emphasis in original). The type of evidence relevant to this inquiry "may include ambiguous statements of animus, comments directed at other employees in the protected group, evidence other employees were treated differently, evidence of pretext, and suspicious timing." *Id.* The category of actions prohibited by Title VII's anti-retaliation provisions is broader than those adverse employment actions protected by its anti-discrimination provisions. *Freelain v. Village of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018); *see also Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 64 (2006) (Title VII's "antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). However, Title VII's "anti-retaliation provision does not protect against petty slights, minor annoyances, and bad manners." *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016).

The parties agree Plaintiff engaged in protected activity when she reported sexual harassment in 2017. IEPA contends Plaintiff cannot establish that it took a materially adverse action against her or the causation element. Plaintiff alleges that, after complaining in 2017 about being subjected to sexual harassment by John Kim, IEPA retaliated against her by its handling of her ADA workplace seating accommodations and the denial of certain of types of leave. Furthermore, Plaintiff argues the denial of her bereavement leave was an adverse action that had a financial impact on her. Plaintiff contends IEPA selectively enforced its rules, policies, and procedures and even repeatedly violated its policies.

In its reply, IEPA contends Plaintiff waived all of her adverse action claims except for that which is based on a denial of bereavement leave by failing to respond to most of its arguments. *See Ripberger v. Corizon, Inc.*, 773 F.3d 871, 879 (7th Cir. 2014) (noting that "perfunctory and undeveloped arguments" are waived); *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (stating district court correctly concluded that plaintiff's failure to respond to defendant's arguments in support of summary judgment on discrimination claims constituted waiver).

In its motion, IEPA contends the following allegations of retaliation do not constitute materially adverse actions: (1) failure to remove/provide furniture; (2) the temperature in the Cave area; (3) not allowing Plaintiff a second opportunity to move cubicles; (4) requiring emails stating she had arrived to or was leaving work; (5) requiring the use of vacation time in lieu of bereavement leave; (6) initially directing use of a COVID-specific time code (though never requiring its use); (7) not being provided a laptop during the pandemic; and (8) giving Plaintiff a hybrid in office/remote schedule that she deemed to be "the worst." In asserting summary judgment is warranted, IEPA argues these are "trivial harms" and "minor annoyances" that do not constitute materially adverse actions. Even if they do qualify as adverse actions, Plaintiff cannot establish a causal connection because there is no suspicious timing between the protected activity and the adverse action and Plaintiff cannot show that other individuals were treated more favorably.

A review of Plaintiff's Response to IEPA's Motion for Summary Judgment shows Plaintiff failed to respond to most of IEPA's arguments concerning whether any

allegations constituted an adverse action. The Introduction section of Plaintiff's brief provides in part: "She was retaliated against in how her ADA accommodations were handled, how her workplace seating assignments were provided, and how she was denied certain types of leave." (Doc. 27 at 1). While Plaintiff's response to IEPA's statements of alleged undisputed facts and her additional statement of alleged undisputed facts references what she claims to be adverse actions, there is almost no discussion of the alleged adverse actions in the Argument section of her brief. Plaintiff alleges the following:

> A jury could reasonably conclude that the IEPA knew that her computer issues were consequential to her. Further, they denied her time off for bereavement leave despite the fact that it was contractually granted to her. This was something that adversely impacted her because it impacted her financially.

(Doc. 27 at 38). The last paragraph before the conclusion of Plaintiff's response brief states:

> Here, Godiksen has pointed out that there was selective enforcement of rules, policies, and procedure. More importantly, they repeatedly violated their policies. She was clearly entitled to bereavement leave, but it was denied against that policy, despite the fact that it had been previously allowed.

(*Id.* at 42). The Court concludes that, by failing to respond to almost all of IEPA's arguments regarding what constituted a materially adverse action, Plaintiff has waived those issues except for the denial of bereavement leave and her allegations concerning computer issues.

While construing all facts and drawing all reasonable inferences in favor of Plaintiff, the Court has no basis to find that the denial of bereavement leave constituted a materially adverse action. The bereavement leave policy allowed for leave for the

employee "to attend the funeral or similar service." It is apparent from the email correspondence between Pam Smith and Karen Weathers that this provision of the bereavement leave policy was interpreted to allow for leave only if there was a funeral or celebration of life or similar event. Smith stated Plaintiff's mother died on June 6 and Plaintiff's request for bereavement leave in early July to deal with estate issues was denied. Plaintiff made another request for bereavement leave for July 22 and July 23, in order "for a celebration of life around my mother's birthday and to grieve, given the proximity to her death." (Doc. 22-31 at 1). While Plaintiff provided her mother's obituary in support of the request for bereavement leave, the obituary did not mention a celebration of life event. Given the lack of documentation referencing an event, Smith reasonably believed that the "celebration of life" was Plaintiff remembering her mother on or around her birthday. The policy also allowed for leave for "bereavement time, upon the death of a member of the employee's immediate family." This portion of the policy could perhaps be interpreted to allow for bereavement leave even if there is no funeral or celebration of life event. However, it is not logically interpreted as allowing leave several weeks after the family member's death. For all of these reasons, the Court is unable to conclude that IEPA's denial of bereavement leave to Plaintiff constituted a materially adverse action.[3]

[3] Plaintiff also alleges the denial of bereavement leave was an adverse action because it affected her financially. However, the record does not support this assertion because Plaintiff was permitted to take paid vacation time.

The only argument Plaintiff makes about computer issues is that IEPA knew the computer issues were consequential to her. The Seventh Circuit has held that, if an employer exploits a particular vulnerability of an employee, that could constitute an adverse action even when it otherwise might not be. *See Washington v. Ill. Dept. of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) (stating that if an employer is aware that an employee "has a nervous condition or hearing problem that makes him miserable when exposed to music for extended periods" and the employer exploits that by moving the employee "from a quiet office to one where Muzak plays constantly," that could constitute an adverse action). Plaintiff contends "[i]t was clear to all that Godiksen was more vulnerable to certain things than others might have been." (Doc. 27 at 38). However, Plaintiff does not cite any evidence in the record that she was more vulnerable to computer issues than any other employee. Plaintiff also cites nothing in the record which suggests this vulnerability was "clear to all." Plaintiff's conclusory assertion that she had a particular vulnerability that was exploited by IEPA is not enough to create a factual dispute.[4]

For all of these reasons, Plaintiff cannot show that she suffered a materially adverse action. Plaintiff has waived most of her claims which relate to alleged adverse actions by failing to develop her arguments. Neither IEPA's denial of bereavement leave nor Plaintiff's computer issues constitute adverse actions. Thus, IEPA is entitled to

---

[4] Plaintiff also suggests that IEPA exploited a particular vulnerability in denying her bereavement leave because such leave was contractually granted to her. However, this was a union contract that applied to numerous employees. Plaintiff does not say how this renders her particularly vulnerable.

summary judgment. Even if Plaintiff could show these occurrences constituted a materially adverse action, Plaintiff cannot establish any causal connection to her protected activity. While Plaintiff alleges there was "selective enforcement of rules, policies, or procedures," she does not provide any evidence of how the bereavement leave policy or any other policies were applied to other employees.

Furthermore, there is no disputed evidence of suspicious timing between Plaintiff's protected activity and IEPA's alleged retaliatory acts. While suspicious timing is usually not enough alone to establish a retaliatory motivation, there are occasionally instances where the adverse action is so close in time to protected activity that an inference of causation can arise. *Upchurch v. Indiana*, 146 F.4th 579, 589 (7th Cir. 2025). This is not such a case. Plaintiff reported harassment to Dana Vetterhoffer in March or April 2017 and to Joanne Olson in August 2017. She also met with Jill Johnson and Vetterhoffer in August 2017. Plaintiff's computer issues did not arise until 14 months later in October 2018. The denial of bereavement leave occurred in August 2019 two years after the last of any protected activity. Neither alleged adverse act constitutes suspicious timing that raises an inference of retaliatory intent. *See e.g., Li v. Fresenius Kabi USA, LLC*, 110 F.4th 988, 998 (7th Cir. 2024) (finding that six months between protected activity and alleged retaliation did not raise an inference of retaliation without other evidence of retaliatory intent).

## III. CONCLUSION

IEPA is entitled to summary judgment on Plaintiff's retaliation claims because Plaintiff has waived certain claims and has otherwise failed to present evidence that she suffered a materially adverse employment action caused by her protected activity. Therefore, Defendant's Motion for Summary Judgment (Doc. 23) is GRANTED. This case is Dismissed with Prejudice. The Clerk will enter Judgment and terminate the case.

ENTER: September 17, 2026

/s/ Colleen R. Lawless
COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE